IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NIKOLAOS VASTARDIS,<br>EVRIDIKI NAVIGATION, INC.,<br>LIQUIMAR TANKERS MANAGEMENT<br>SERVICES, INC.,<br>                Defendants. | Criminal No. 19-66-RGA |

**MEMORANDUM ORDER**

Before me is Defendants' Motion to Suppress evidence and statements by Nikolaos Vastardis. (D.I. 46). The Parties have briefed the issues. (D.I. 49, 59, 60, 77, 78). Because I find that the Fourth Amendment was not violated, I will deny Defendants' motion.

**I.    BACKGROUND**

Defendants are charged in a four-count indictment with crimes related to environmental violations committed on board the M/T Evridiki. (*See* D.I. 16). The M/T Evridiki is a Liberian flagged oil tanker, owned by Evridiki Navigation, and operated by Liquimar Tankers Management Services. Large ocean-going vessels like the M/T Evridiki produce a considerable volume of oily waste. The primary types of oily waste are sludge and bilge waste. Sludge is generated when petroleum products are purified for use in the ship's engines. Acceptable methods for disposing of sludge are incineration on board the vessel or offloading at port.

Bilge waste is a mixture of oil and water that accumulates at the bottom of the ship, also known as, the bilge. Oil accumulates in the bilge as it leaks from machinery on the ship. Bilge waste is collected, stored, and processed on the ship to remove oil from the water before it is

1

dumped overboard. The separation process is completed by a device known as the Oily Water Separator, in conjunction with an Oil Content Monitor. Pursuant to environmental regulations, water can be sent overboard only if it is at or below 15 parts per million of oil. All discharges and internal transfers of bilge waste are recorded in the ship's Oil Record Book.

On March 10, 2019, the M/T Evridiki arrived in the Delaware Bay. The next day, the United States Coast Guard boarded the vessel to conduct a previously announced Port State Control inspection. The inspection included an examination of the operability of the ship's Oily Water Separator. At that time, Defendant Nikolaos Vastardis served as the M/T Evridiki's Chief Engineer. He oversaw all engine room operations, supervised all engine room crew members, and reported directly to the Captain. He was the individual responsible for the Oily Water Separator and making entries into the Oil Record Book.

Chief Vastardis conducted operational testing of the Oily Water Separator under the supervision of Coast Guard inspectors. When running the Oily Water Separator with the valves that provided Oily Water Separator-treated bilge wastewater to the Oil Content Meter for sampling in a closed position, the Oil Content Meter registered zero parts per million of oil. When operating the Oily Water Separator in compliance with legal standards, Chief Vastardis was not able to run the system without setting off the alarm in the Oil Content Meter. The alarm indicated that the oil content of the water was in excess of 30 parts per million of oil.

As a result of the March 11 inspection, the inspector concluded that further inspection of the Oily Water Separator was necessary. Further inspection led to a decision to expand the Port State Control inspection to include MARPOL compliance. The Coast Guard concluded its inspection on March 13, 2019.

As a result of the inspection, the Coast Guard suspected that the Oily Water Separator on board the Evridiki was likely not capable of separating out oil to meet the legal requirement and cited the M/T Evridiki with more than ten deficiencies. The Coast Guard further suspected that Chief Vastardis knew about the deficiency with the Oily Water Separator and operated it in a manner that resulted in the discharge of bilge wastewater that contained impermissibly high levels of oil. The Coast Guard detained the vessel until the vessel owner provided security authorized by 33 U.S.C. § 1908(e). The Agreement on Security, reached between the government and entity Defendants, required that the company post a bond and included certain other non-monetary conditions, including providing for the crew.

Chief Vastardis, whose first language is Greek, was interviewed in English by Coast Guard authorities on March 13, 2019. The interview took place in the ship's office and was conducted by Chief Warrant Officer Aaron Studie and Lieutenant Thomas McGuire. Neither CWO Studie nor Lt. McGuire was carrying a weapon. During the interview, the door to the ship's office was closed. The interview was recorded and lasted 29 ½ minutes.

## II. DISCUSSION

There are three primary issues raised in Defendants' Motion to Suppress: (1) whether the warrantless search of the M/T Evridiki violated Defendants' Fourth Amendment rights, (2) whether the Coast Guard's questioning of Chief Vastardis resulted in involuntary statements or violated *Miranda*, and (3) whether the Agreement on Security is unconstitutional.

### 1. Search of the M/T Evridiki

The Coast Guard's search of the M/T Evridiki did not violate Defendants' Fourth Amendment rights. The Coast Guard possesses broad, general authority to board foreign vessels

3

in United States Waters to conduct warrantless safety and document inspections as well as searches, seizures, and arrests. This authority is provided by 14 U.S.C. § 522(a):

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection and suppression of violations of the laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

If a Coast Guard official develops a reasonable suspicion of criminal activity during a safety and document inspection, he or she may search the vessel without a warrant. *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 2017 (3d Cir. 1998).

The Coast Guard also has certain specific authority to inspect a ship to determine its compliance with the International Convention for the Prevention of Pollution from Ships ("MARPOL") and the Act to Prevent Pollution from Ships ("APPS"). It has the authority, for example, to examine the Oil Record Book or International Oil Pollution Prevention Certificate. *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006) (citing 33 U.S.C. § 1904(c); 33 C.F.R § 151.23(a)(3), (c)). The Coast Guard can expand its examination of the ship if "clear grounds exist which reasonably indicate that the condition of the ship or its equipment does not substantially agree with the particulars of its certificate." 33 U.S.C. § 1904(d). It can also inspect to "verify whether or not the ship has discharged a harmful substance in violation of the

4

MARPOL Protocol, Annex IV to the Antarctic Protocol, or [APPS]." 33 U.S.C. § 1907(c)(2)(A). The specific contours of such inspections are outlined in 33 C.F.R. § 151.23, which allows inspection of the ship's Oil Record Book, oil content meter records, and an examination of the ship.

The Coast Guard did not violate the Fourth Amendment when it searched the M/T Evridiki. Binding Third Circuit precedent holds that the Coast Guard can conduct a warrantless search of a vessel given a reasonable suspicion of criminal activity. *Varlack Ventures, Inc.*, 149 F.3d at 217. The Coast Guard boarded the M/T Evridiki for the purpose of conducting a Port State Control examination. Such an examination includes inspecting documents and doing safety testing.

The March 11, 2019 inspection and search of the M/T Evridiki complied with the statutory requirements. The Coast Guard first inspected the documents, then examined the equipment to verify substantial compliance with the documents and codes. The Oily Water Separator, upon examination, raised questions and concerns for the Coast Guard. Thus, they expanded their examination to an extended MARPOL investigation as to the Oily Water Separator. During the examination, the Coast Guard authorities developed a reasonable suspicion of criminal activity related to the Oily Water Separator. Specifically, they noticed inconsistencies with the Oil Record Book and irregularities related to the setup of the equipment. Once the Coast Guard developed a reasonable suspicion of criminal activity, pursuant to *Varlack Ventures*, they were free to complete a search of the vessel without a warrant. Thus, the Coast Guard's search did not violate the Fourth Amendment. I will not suppress evidence obtained as a result of the search of the M/T Evridiki.

**2. Questioning of Chief Vastardis**

5

*Miranda* warnings are required where a suspect is both: (1) taken into custody, and (2) subject to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "The burden is on the defendant to establish that he was subject to custodial interrogation." *United States v. Mejia*, 2016, WL 7191630, at *20 (D.V.I. Dec. 10, 2016) (collecting cases). Determining whether an individual is "in custody" for *Miranda* purposes involves two inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

"Routine questioning by the Coast Guard or Customs officials is not the sort of custodial situation that normally triggers the *Miranda* requirement." *United States v. Troise*, 796 F.2d 310, 314 (9th Cir. 1986); *see also United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992); *United States v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988); *United States v. Kiam*, 343 F. Supp. 2d 398, 405 n.10 (E.D. Pa. 2004). However, "once [Coast Guard] agents have probable cause to believe that the person they are questioning committed an offense, and that person reasonably believes that he is not free to leave, *Miranda* warnings should be administered." *Troise*, 796 F.2d at 314.

The Coast Guard's March 13, 2019 interview of Chief Vastardis was not a custodial interrogation. The interview was conducted by two unarmed members of the Coast Guard as part of a routine inspection. Officer Studie and Lt. McGuire testified that the purpose of the March 13 interview was to clarify "questions and discrepancies" that were identified by Coast Guard officers inspecting the tanker. (D.I. 75 at 87). The testimony of both Officer Studie and Lt. McGuire during the suppression hearing is confirmed by the generally nonhostile tone and demeanor of the recorded interview. (D.I. 64 Ex. 4). Given the circumstances surrounding the

6

March 13 interview, I find that a reasonable person in Chief Vastardis' position would have felt free to leave. Thus, I find that Chief Vastardis was not in custody for *Miranda* purposes. I will not suppress his March 13 statements based on a violation of *Miranda*.

### 3. Agreement on Security

Defendants argue that the Agreement on Security, which requires Defendants to continue to pay employees through their depositions or trial, violates their Fifth Amendment right against self-incrimination and due process. Their argument is a non-starter. A corporation is not protected by the constitutional privilege against self-incrimination. *United States v. 42 Jars, More or Less, Bee Royale Capsules*, 264 F.2d 666, 670 (3d Cir. 1959); *see also United States v. Kordel*, 397 U.S. 1, 7 n.9 (1970) ("That the corporation has no privilege is of course long established ...."). Thus, the fact that the corporate Defendants were required to sustain their crew during proceedings does not violate the corporations' rights against self-incrimination.

Defendants present a lengthy discussion of the general principles of fairness and justice underlying the Due Process Clause. (D.I. 49 at 23-26). Their argument does not fit within the contours of a motion to suppress as there is no clear delineation of which evidence would need to be suppressed if they were to succeed. This is because, as I understand their argument, the Government's entire case would need to be suppressed if Defendants were successful. Thus, I will address it not as a motion to suppress, but as a challenge to the indictment.

"[A] criminal defendant may raise a due process challenge to an indictment against her based on a claim that the government employed outrageous law enforcement investigative techniques." *United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998). "The challenged conduct must be shocking, outrageous, and clearly intolerable.... The cases make it clear that

this is an extraordinary defense reserved for only the most egregious circumstances." *Id.* at 230-31 (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992)).

In this case, the conduct is not so shocking or outrageous as to render it intolerable. Under the APPS, when a ship is found to be in violation of the Act, "[c]learance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." 33 U.S.C. § 1908(e). Thus, while conditions for the release of a ship are set by the Secretary of Homeland Security, the Secretary is not under an obligation to release the ship at all. I do not find it shocking or unreasonable that the Secretary, in exchange for allowing Defendants the return of their ship, would require that Defendants provide for their crew during the pendency of a criminal case related to the released ship. The alternative would, in my opinion, be less reasonable. That is, granting Defendants the return of their ship and allowing Defendants to abandon their former crew in the United States through the end of Defendants' criminal trial would be less reasonable than the surety actually required by the Secretary in this case. Thus, I will deny Defendants' motion to suppress based on the Due Process Clause.

### III. CONCLUSION

Defendants' Joint Motion to Suppress Evidence (D.I. 46) is **DENIED.**

IT IS SO ORDERED this 12 day of November 2019.

*Richard G. Andrews*
United States District Judge